UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
------------------------------------------------------------------- X
GLORY N. NNA, ADMINISTRATRIX OF THE ESTATE
OF HILLARY OBIOMA NNA, MICHAEL P. MASON,
JORY S. MASON and PETER LEE,           :
                                        :
            Plaintiffs,                 :
                                        : Civil No.
v.                                      : 06-11950-DPW
                                        :
AMERICAN STANDARD, INC.,                :
                                        :
            Defendant.                  :
------------------------------------------------------------------- X

**DEFENDANT AMERICAN STANDARD, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY**

                              ADLER, COHEN, HARVEY, WAKEMAN
                              & GUEKGUEZIAN, LLP
                              A. Bernard Guekguezian (BBO # 559191)
                              Gabriel W. Bell (BBO # 659593)
                              75 Federal Street, Tenth Floor
                              Boston, MA 02110

                              *Attorneys for American Standard, Inc.*

*Of Counsel*:

DEBEVOISE & PLIMPTON LLP
Maura K. Monaghan

8

22862562v6

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT...................................................................................................................................4

CONCLUSION..............................................................................................................................13

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ankuda v. R.N. Fish & Son, Inc.*,
   535 F. Supp. 2d 170 (D. Me. 2008) ...................................................................................6

*Beaudette v. Louisville Ladder, Inc.*,
   462 F.3d 22 (1st Cir. 2006) ............................................................................3, 5, 8, 12

*Bogosian v. Mercedes-Benz of N. Am., Inc.*,
   104 F.3d 472 (1st Cir. 1996) ..............................................................................5, 6, 7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .............................................................................1, 3, 4, 6, 7, 8, 12

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ....................................................................................................4, 12

*Grimes v. Hoffmann-LaRoche*,
   907 F. Supp. 33 (D.N.H. 1995) ...................................................................................12

*Levin v. Dalva Bros.*,
   459 F.3d 68 (1st Cir. 2006) ............................................................................................7

*McGovern v. Brigham & Women's Hosp.*, No. 07-10643-WGY, 2008 U.S. Dist.
   LEXIS 94403 (D. Mass. 2008) ................................................................................7, 12

*Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*,
   161 F.3d 77 (1st Cir. 1998) .........................................................................................4, 5

*Sutera v. Perrier Group of Am.*,
   986 F. Supp. 655 (D. Mass. 1997) ...............................................................................12

*The Hartford Ins. Co. v. Gen. Elec. Co.*,
   526 F. Supp. 2d 250 (D.R.I. 2007) ................................................................................5

## FEDERAL RULES

Fed. R. Evid. 702 ................................................................................................................1, 6, 7

Defendant American Standard, Inc. (hereafter "American Standard") respectfully submits this Memorandum of Law in support of its Motion To Exclude Expert Testimony.

## PRELIMINARY STATEMENT

The decision of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) requires District Courts to act as gatekeepers in evaluating the reliability of expert opinions in order to determine their admissibility under Federal Rule of Evidence 702.  The plaintiffs in the present case allege that the pneuphonic horn manufactured by the sole defendant in this case, American Standard, was the proximate cause of the injuries they suffered when they were struck by an MBTA Orange Line train while working to repair a switch.  The plaintiffs' theory is that the horn malfunctioned and that, had the horn sounded when the MBTA Motorman says he attempted to blow it, they would have avoided the collision.  A critical question, therefore, is whether the plaintiffs would have reacted in time to escape the oncoming train.

The plaintiffs' sole evidence on this point consists of the wholly conclusory opinions of two experts.  One expert opines that:

> A speed of 38 mph [the speed the MBTA calculated the Orange Line train was proceeding at] equates to 55.73 feet per second (fps). Motorman Daniel MacKay estimates that he attempted to sound the horn when his train was 60-70 yards from the workers.  This is 180-210 feet.  Ignoring the additional time afforded by the slowing of the train due to

2

> braking before the point of impact, the train would have reached the workers in 3.2-3.8 seconds.
>
> If the horn had sounded as intended, the sound would have reached the workers in .2 seconds, leaving the men 3-3.6 seconds to react and get out of the path of the train. The reasonable reaction time in these circumstances for a "reasonably expected event" would be no more than 1-1.5 seconds, leaving 1.5-2.6 seconds for the men to move a distance of no more than one half the width of the Orange Line car. Car specifications show a total width of the car to be 9.25 feet. Half of this is a distance of 4.625 feet.
>
> It is entirely reasonable to expect that these three experienced MBTA employees would have immediately understood the urgency to move away from the path of the train upon hearing the train horn. Given the maximum distance of 4.625 feet to completely avoid contact with the train, it is much more likely than not that these men would have been able to reach a point of safety in the time available, using the most conservative estimates of that amount of time.

Report of Thomas E. Johnson, P.E. of Railroad and Metallurgical Engineering, Inc., attached to Aff. of Att'y Bell at Ex. A, at 8. Plaintiffs' second expert offers an even more naked and unsupported assessment:

> Had the horn operated properly when activated by motorman MacKay approximately 60 to 70 yards from the workers, there was more than sufficient time for the workers to clear the track and the accident would have been prevented.

Report of John W. Mroszczyk, PhD, PE, CSP of Northeast Consulting Engineers, Inc., attached to Aff. of Att'y Bell at Ex. B, at 9.[1]

These wholly conclusory opinions by plaintiffs' proposed experts fail to meet the *Daubert* test for admissibility, for multiple reasons:

- The proposed experts lack expertise, training or education in the relevant field of human factors;

- The proposed experts' conclusions lack any evidentiary basis;

- The proposed experts' conclusions were not subjected to any empirical testing or validation;

- The proposed experts have failed to employ the generally accepted methodology in the scientific community for determination of the issue on which they have opined and have instead offered nothing more than *ipse dixit.*

The deficiencies in the experts' opinions mandate their exclusion. Exercising its gatekeeping function, the Court should exclude the opinions at this stage and grant American Standard's accompanying Motion for Summary Judgment. *See, e.g., Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22 (1st Cir. 2006) (affirming grant of a combined motion to exclude plaintiff's expert testimony and for summary judgment on the ground that without inadmissible expert testimony plaintiff could not establish causation element of manufacturing defect claims).

---

[1] Both experts offered opinions on other issues in the case, including the cause of the horn's alleged failure and the adequacy of warnings relating to its alleged defect. The present Motion challenges only the experts' opinions regarding reaction time if the horn had sounded, although American Standard reserves the right to challenge the admissibility of the experts' opinions as to other issues in the future.

## ARGUMENT

*Daubert* sets forth a non-exhaustive list of factors to be considered in evaluating the reliability of an expert opinion: (1) whether the scientific theory or technique proffered by the expert "can be (and has been) tested"; (2) whether the theory has been subject to peer review; (3) the rate of error of the theory/technique; and (4) whether the methodology is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-94. These factors are all, of course, focused on the methodology employed by the proposed expert. In *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997), however, the Supreme Court emphasized that, apart from methodological considerations, *Daubert* does not sanction admitting "opinion evidence which is connected to existing data only by the *ipse dixit* of the expert" and, on the facts of the case, found "too great an analytical gap between the data and the opinion proffered." *Id.* The Court held that a study demonstrating that infant mice injected with massive doses of PCB developed cancer and four epidemiological studies, none of which showed a direct link between PCB exposure and cancer, were insufficient to support an expert's conclusion that PCB exposure caused plaintiff's cancer. *Id.* at 144-45.

In *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77 (1st Cir. 1998), the Court of Appeals for the First Circuit elaborated on the meaning of *Joiner*:

> [W]hile methodology remains the central focus of a *Daubert* inquiry, this focus need not completely pretermit judicial consideration of an expert's conclusions. Rather, trial judges may evaluate the data offered to support an expert's bottom-line opinions to determine if that data

5

>     provides adequate support to mark the expert's testimony
>     as reliable.

*Id.* at 81.

Courts within the First Circuit have relied on these principles to exclude expert opinions that are excessively conclusory. In *Beaudette*, for example, the court excluded the opinion of plaintiffs' expert who, based on a visual inspection of an allegedly defective ladder and standards promulgated by an industry organization, opined that defendant's product was defective. *Beaudette*, 462 F.3d at 24. The expert offered no testing or literature to support his opinion; he stated that a ladder must be free of "resin-rich pockets" in order to be safe "but had no support for his opinion." *Id*. at 25. Similarly, in *The Hartford Ins. Co. v. Gen. Elec. Co.*, 526 F. Supp. 2d 250 (D.R.I. 2007), the court adopted the Magistrate Judge's recommendation and excluded the opinions of two fire cause experts that a defect in defendant's product caused the fire at issue. The court held that while scientific testing supported the experts' conclusion that chlorine corrosion was the cause of water leakage, there was no support at all for the experts' further conclusion that the corrosion would have caused the water dispenser's heat sensor to malfunction, resulting in a fire. *Id.* at 252.

Here, the proposed experts' opinions suffer from multiple deficiencies that preclude their admission. First, neither of the plaintiffs' proposed experts possesses experience or expertise in the field applicable to the reaction time question. With all expert testimony, the court must initially determine whether a scientific expert is qualified. *See Bogosian v. Mercedes-Benz of N. Am., Inc.*, 104 F.3d 472, 476 (1st Cir.

1996). Rule 702 of the Federal Rules of Evidence assigns to the trial judge the responsibility for ensuring that an expert witness is "qualified as an expert by knowledge, skill, experience, training, or education . . .." Fed. R. Evid. 702. To fulfill this gate-keeping role, the court must determine whether the expert possesses some specialized knowledge such that his or her testimony will be helpful to the trier of fact. *See Daubert*, 509 U.S. at 590-91. If an expert cites his experience as a qualification, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Ankuda v. R.N. Fish & Son, Inc.*, 535 F. Supp. 2d 170, 174 (D. Me. 2008) (quoting Fed. R. Evid. 702 advisory committee's note). A district court has "broad discretionary powers in determining whether or not the proposed expert is qualified." *Bogosian*, 104 F.3d at 476.

Here, neither of plaintiffs' proposed experts has the required expertise in the area on which he has opined. Dr. Mroszczyk holds a PhD in Applied Mechanics and a Master's Degree in Mechanical Engineering. His bachelor's degree was in Aerospace Engineering. Although he has worked in the area of safety, he lists no work experience in human factors analysis on his curriculum vitae and none of his publications concern human factors. Mr. Johnson identifies himself as an "engineering consultant" and lists fourteen areas of expertise, none of which involve human factors analysis. His first two listed areas of expertise are "Metallurgical Engineering" and "Railroad Engineering" in keeping with the name of his company "Railroad & Metallurgical Engineering, Inc." His report purports to focus on "Accident Reconstruction" and "Horn Failure Analysis." The

7

expert opinions that are the subject of this Motion do not address how the train operates, or even how the horn operates, but how human beings – and in particular, these MBTA workers -- react to particular events.  Neither Mr. Johnson nor Dr. Mroszczyk, regardless of how learned they are in other areas, offer any expertise in that area.  In fact, their opinions regarding the workers' reaction time appear to be ancillary add-ons to their main findings regarding the design of the horn.  *See* Johnson Report at 12; Mroszczyk Report at 9.  As the accompanying Affidavit of Robert Sugarman confirms, neither of plaintiffs' experts is qualified to opine regarding human factors.  *See* Sugarman Aff., attached to Aff. of Att'y Bell at Ex. C, at ¶¶ 12, 25; *see also Levin v. Dalva Bros.*, 459 F.3d 68, 78 (1st Cir. 2006) (noting that the fact that "a witness qualifies as an expert with respect to certain matters or areas of knowledge, [does not mean] that he or she is qualified to express expert opinions as to other fields") (citation omitted); *Bogosian*, 104 F.3d at 477 (upholding district court finding that proposed expert witness, who had extensive experience in automotive repair but did not have expertise with design defect issues, could not testify on the issue of a transmission design defect).

      Even if a scientific expert is qualified, that does not end the court's inquiry.  Instead, the court must next determine whether the testimony rests on a reliable foundation.  *Daubert*, 509 U.S. at 597.  "To satisfy this requirement, expert testimony must be the product of reliable principles and methods, and the expert must have applied the principles and methods reliably to the facts of the case."  *McGovern v. Brigham & Women's Hosp.*, No. 07-10643-WGY, 2008 U.S. Dist. LEXIS 94403, at *10 (D. Mass. 2008) (citing Fed. R. Evid. 702).

Although *Daubert* focuses the trial court's evaluation on a proposed expert's methodology, here there is a complete absence of methodology. Rather than offer any scientific analysis at all, plaintiffs' proposed experts have simply pronounced their conclusion. *Beaudette*, 462 F.3d at 25. As Dr. Sugarman has confirmed, plaintiffs' proposed experts have not used any methodology, including MTM-1, which is generally accepted by the scientific community for this type of analysis and that has been subject to peer review. Sugarman Aff. at ¶¶ 5-6; *Daubert*, 509 U.S. at 593-94.

Nor have plaintiffs' proposed experts attempted to validate or test their conclusions. *Daubert*, 509 U.S. at 593. Strikingly, although both proposed experts prominently showcase expertise in "accident reconstruction" on their curricula vitae, they have made no attempt to reconstruct this accident and to see whether, under similar conditions, individuals would react to a horn sounding in the time they posit the MBTA workers would have.

Finally, the proposed experts offer no evidentiary basis for their conclusions at all. For example, Mr. Johnson characterizes the Orange Line train's approach as a "reasonably expected event." It appears to be critical to his calculation of reaction time that the event was "expected" although he offers no explanation for why that is so. But as demonstrated in American Standard's Motion for Summary Judgment, the train was moving at a speed four times the mandated speed for a train entering an area with a work crew and had its headlights turned off, both violations of MBTA rules. *See* Motion for Summary Judgment at p. 14-15; MBTA Safety Department Final Report 05-05, Code II – Wellington – Switch #83 ("MBTA Final Report"), attached to Aff. of Att'y Bell at Ex. D,

9

at p. 3-4. An MBTA report found that the motorman who was operating the train should have been aware of the presence of the crew but was not due to extraordinary inattentiveness. *See* MBTA Final Report, at p. 3-4. Under MBTA rules and practices, the reasonable expectations did not encompass a train moving at nearly 40 miles per hour in the dark towards the work crew operated by a motorman who was not exercising the required caution and attention with awareness of the crew's location. Mr. Johnson offers no basis for why this would be an expected event. There is no evidence in the record that any of the MBTA workers had ever had a close call with a train before and had been required to jump out of the way.

Neither Mr. Johnson nor Dr. Mroszczyk take any account of the actual location or condition of the plaintiffs in their calculations, either. The undisputed testimony is that the workers had their backs to the train; two were leaning over and one (Mr. Nna) was in a kneeling position, with both knees on the ground. Dep. of Daniel MacKay ("MacKay"), attached to Aff. of Att'y Bell at Ex. E, at 90-92; MBTA Final Report, at p. 12. In addition, at least one of the workers was obese and suffered from obstructive sleep apnea. *See* Report of Michael A. Fifer, M.D., dated July 28, 2008 regarding Michael P. Mason, attached to Aff. of Att'y Bell at Ex. F, at 1. Moreover, in violation of MBTA rules, no drug screens were performed on the crew members to determine whether they might be taking (as the motorman was) a drug that might affect their reaction time. *See* MBTA Final report, at p. 24. Neither expert makes any attempt to analyze whether the MBTA workers' health might have impacted their reaction time, or whether their positions might have slowed them. *See* Sugarman Aff. at ¶ 17 ("Mr. Mroszczyk did no

10

analysis of the minimal actions that would be undertaken by Mr. Nna to escape from the tracks and consequently no analysis of the minimum time it would take for Mr. Nna to escape."); ¶ 29 ("Mr. Johnson did no analysis of the minimal actions that would be undertaken by the workers to avoid the train and consequently no analysis of the minimum time it would take them to escape.").

Perhaps even more fundamentally, both plaintiffs' proposed experts are operating on a mistaken premise. Both experts appear to assume that the motorman attempted to sound the horn when he was 60-70 yards from the work crew. What the record reflects, however, is that the motorman stated that he first saw the work crew when he was 60-70 yards away from them. Mr. MacKay testified that before attempting to sound the horn he "put the train into emergency" by swinging the Cineston handle counterclockwise to the right, then "jumped out of his seat," "moved his body forward," and only then leaned on the horn with his left hand. MacKay Dep. at 94-96. In fact, according to Mr. MacKay, he struck the workers immediately after the horn failed to sound – it was the last event before the collision. MacKay Dep. at 97 ("Q: What happened next [after horn did not sound]? Did you then strike the three workers on the track?" "A: Yes."). The proposed experts' failure to take account of the sequence of events that would have had to occur before the motorman attempted to sound the horn means that they have measured their conclusory reaction time from the wrong starting point. See Sugarman Aff. at ¶ 28 ("Mr. Johnson did no analysis of the minimal actions that would be undertaken by the motorman, Mr. MacKay, and consequently no analysis of the minimum time it would take Mr. MacKay to sound the horn."); ¶ 16 ("Mr. Mroszczyk did no analysis of the

11

minimal actions that would be undertaken by the motorman, Mr. MacKay, and consequently no analysis of the minimum time it would take Mr. MacKay to sound the horn.").

Having failed to take any account of the actions that the motorman would have had to undertake between seeing the crew and attempting to activate the horn, the plaintiffs' proposed experts have necessarily also failed to take account of any circumstances that might have slowed the motorman's implementation of those actions. Mr. MacKay testified that he had taken a prescription sleep aid, either Ambien or Tradozone, at approximately 2 a.m. on the morning of January 27, 2005; the accident took place at approximately 7:00 p.m. that evening.  MacKay Dep. at 71-72.  The MBTA rules do not permit employees taking such medications to work in safety sensitive positions in part because their reflexes can be adversely impacted.

In addition, neither of plaintiffs' proposed experts attempts to analyze whether the weather and terrain would have had any effect on the MBTA workers' reaction time.  By all accounts, the weather was frigid the night of the accident.  The crew was out on the tracks precisely because a switch had frozen.  It had snowed earlier in the week.  The workers' realization of the approach of the train might well have been affected by visibility; Mr. MacKay testified that visibility was poor and snow was swirling around. MacKay Dep. at 93.  Although even laypeople are aware that freezing temperatures can numb extremities and slow movement, plaintiffs' proposed experts' calculations do not appear to take account of those conditions.

12

The plaintiffs' proposed experts have offered definitive but entirely unsupported opinions on a critical issue in the case. Because those opinions are unsupported by any scientific analysis, divorced from any supporting data, and unconnected to the specific circumstances of this case, the experts' wholly conclusory opinions that "it is much more likely than not that these men would have been able to reach a point of safety in the time available, using the most conservative estimates of that amount of time " and that "[h]ad the horn operated properly when activated by motorman MacKay approximately 60 to 70 yards from the workers, there was more than sufficient time for the workers to clear the track and the accident would have been prevented" should be excluded as inadmissible, under well-settled law. *See Joiner*, 522 U.S. at 144-45; *Daubert*, 509 U.S. at 592-93; *Beaudette*, 462 F.3d at 25. Further, because proof of an essential element of plaintiffs' case depends on inadmissible expert opinion, American Standard's accompanying Motion for Summary Judgment should be granted. *See Sutera v. Perrier Group of Am.*, 986 F. Supp. 655, 667-68 (D. Mass. 1997) (Saris, J.) (granting summary judgment for defendants because plaintiff "offered no reliable scientific evidence tending to show a causal link" between defendants' product and plaintiff's illness); *Grimes v. Hoffmann-LaRoche*, 907 F. Supp. 33, 39 (D.N.H. 1995) (excluding testimony of ophthalmologist on causation because his opinion failed "*Daubert's* reliability and fit requirements" and granting summary judgment for defendants); *McGovern* 2008 U.S. Dist. LEXIS 94403, at *19 (dismissing case on summary judgment after excluding plaintiff's sole expert on causation).

## CONCLUSION

For all the above reasons, the Court should schedule a hearing on the issues presented by this Motion as soon as practicable and should grant the Motion To Exclude.

Dated:  November 26, 2008            Respectfully Submitted,


                                                __/s/ A. Bernard Guekguezian_____

ADLER, COHEN, HARVEY, WAKEMAN
& GUEKGUEZIAN, LLP
A. Bernard Guekguezian (BBO # 559191)
Gabriel W. Bell (BBO # 659593)
75 Federal Street, Tenth Floor
Boston, MA 02110

*Attorneys for American Standard, Inc.*


*Of Counsel*:

DEBEVOISE & PLIMPTON LLP
Maura K. Monaghan

14

## CERTIFICATE OF SERVICE

I, Gabriel W. Bell, do hereby certify that on November 26, 2008, this document was filed with ECF system to be electronically served upon all registered participants as identified on the Notice of Electronic Filing .

          __/s/ Gabriel W. Bell_____

22862562v6